DODGE & a. *v.* STICKNEY, Ex'r.

The questions of a party's right to appeal from a probate decree, and of his right to a reversal of the decree, may be determined at one hearing on his petition for leave to appeal, under Gen. Laws, c. 207, s. 9, when justice and convenience require such a course.

If it is reasonably necessary for an executor to employ agents or attorneys in the administration of the estate, and if he uses ordinary care in their selection and exercises a prudent supervision over them, he is not liable for a loss to the estate caused by their fraud or indiscretion, without fault on his part.

PETITION, for leave to appeal from a decree of the probate court. Facts found by a referee. George H. Dodge died in 1862, leaving a widow, seven children (the petitioners), and a will, with Stickney as executor. The widow waived the provisions of the will, but is not a party to this petition. Among the assets was a mortgage from W. H. H. Bailey to Dodge to secure two notes— one for $2,300, another for $1,790—and also the reconveyance of a large number of shares of Manchester & Lawrence Railroad stock which Dodge had loaned to Bailey. The mortgage was not signed by Bailey's wife. Dodge, in his lifetime, had informed Stickney that Bailey was indebted to him in a large amount, and that he had in some way security upon property at the West. The mortgage conveyed a large amount of land in the state of Wisconsin, consisting of lots in the city of Janesville, and more than five thousand acres of unimproved lands in different parts of the state. Dodge, in his lifetime, had employed Sloan & Patten, a firm of lawyers and real estate agents, residing at Janesville, to act for him in relation to the Bailey mortgage. The executor made careful inquiry, and ascertained that Sloan & Patten were men of good business reputation in Janesville; that they had the confidence of those best situated to judge of their fitness to act as agents in the care of a large interest in real estate in Wisconsin. Stickney opened correspondence with them, and they agreed to act for him as they had for the testator. They were requested to cause the mortgaged lands to be examined, to ascertain the value, situation, validity of title, what taxes were due, etc. They reported, among other things, that there was difficulty in identifying some of the lands; that the description in some instances was ambiguous or erroneous; that a new mortgage was desirable in case no rights of third parties had intervened; that all the lands had been sold for taxes, some as early as 1856; that, notwithstanding the sale for taxes, they could redeem, as the counties had in most instances bought the land at tax sale; and that some of the lands were not worth redeeming. The executor informed Sloan & Patten that he should depend upon their care and diligence in looking after these lands, and that they must, after examination, decide what to do in the redemption of the property and the foreclosure of the mortgage.

Before July, 1864, they sent to the executor a schedule of taxes due upon the mortgaged lands, with a description of the lots, and an estimate (made without actual examination) of the value. This statement showed that, including the tax of 1863, cost and interest, there was due the sum of $3,379.69. They suggested that it would not be advisable to commence redemption until an examination had been made by themselves or some approved agent known to them. Having been requested by the executor to make the necessary examination, they promised to do it personally, or by some one in whom they had confidence. July 5, 1864,

the executor sent $1,500 to Sloan & Patten, to be used in their discretion in redeeming lands sold, and informed them that when more money was needed he would send it on demand. He had before sent them $75. They acknowledged the receipt of the money, and gave the executor to understand that they would use the $1,500 in redeeming lands, and send for more if it could be used to the advantage of the estate.

At this time Bailey was in the West, and, through Sloan & Patten, communication was opened with him in reference to the execution of a deed of the lands to Stickney, as executor, with the release of dower by Mrs. Bailey, to save the expense of foreclosure. Bailey claimed that there was but little due on the mortgage, and that his former partners in the East ought to pay two thirds of what was due. He made many propositions looking towards the conveyance by himself and wife of a part of the lands to Stickney, as executor, and the release of the balance to his wife, as he was insolvent, none of which were satisfactory to the executor. Continuous correspondence was kept up between Sloan & Patten and the executor from 1863 to 1866, and from that time to 1869 by Patten, without the least intimation on the part of Sloan & Patten, or Patten, that there was need of more money, or that the interests of the estate were in the least suffering by reason of anything the executor could do, which had not been done. On the contrary, Sloan & Patten and Patten assured him from time to time that they were continuing their negotiations with Bailey; that they had caused parties employed by them to take the tax titles in their own names, the result of which would be to cut off the dower of Mrs. Bailey, and greatly benefit the estate; they also gave satisfactory reasons for not proceeding with the foreclosure of the mortgage.

In the latter part of 1869 Stickney became convinced that Sloan & Patten or Patten had not been acting in good faith, and informed the family of the testator of his conviction. It was then decided to send one Drew, a friend of the family, to Wisconsin, who reported that Patten had embezzled the $1,500; that no taxes had been paid, and no steps taken to foreclose the mortgage. Thereupon Stickney went to Wisconsin. He also made a second visit in 1872. He found Drew's report to be true,—that Patten had deceived him in many important particulars; that there was no tract of land which as a matter of right he could redeem; that Patten was worthless; that Sloan claimed he was not a partner in July, 1864; that it would not be an act of prudence to commence a suit against Sloan for the money lost, or other default of himself or Patten. At this time he did what he could to protect the estate by buying off parties in whom the tax title resided for less than the value of the lands. He also completed the foreclosure of the mortgage. In this way, including his own expenses and that of his attorney, he expended the sum of $6,291.89, and secured

the title to about twenty-four hundred acres to the estate. The value of the lost lands in 1870 exceeded ten thousand dollars.

By the provisions of the will the personal estate of the deceased was to be divided in the year 1875. Early in that year the executor made up his account to the probate court, giving a detailed statement of all his receipts and disbursements up to that time. The debit side showed, among other things, that he charged himself with "amount received from sale of Western lands, $1,167.90." The credit side showed that he discharged himself to the amount of "$6,291.89 paid for taxes, cost, and interest to redeem Western lands."

In the account as originally made up the executor had credited himself with the notes of George D. Dodge, one of the heirs, to the amount of $3,400 or thereabouts. Some time before the day fixed for the settlement of the account of 1875, W. H. Dodge, a lawyer and an heir, called upon the executor for the purpose of examining his accounts from the beginning. The executor gave him every paper and book of account in his hands pertaining to the settlement of the estate, including all papers relating to the Western lands which he had. Martha K. Dodge, one of the heirs, had employed N. R. Stanton, a lawyer in New York city, where she then resided, to represent her at the settlement. Stanton came to Dover; and while the papers were in W. H. Dodge's hands, spent from one to two weeks in an examination of Stickney's accounts from the beginning. George D. Dodge and Oliver A. Dodge were at Dover when Stanton and W. H. Dodge were at work upon the papers, and had an opportunity to examine for themselves, but made little, if any, examination in the matter. Stanton was a friend of the family, and the evidence tended to show that all these petitioners understood that Stanton's examination for his client Martha K. would inure to the benefit of all, and that they were content to make his examination theirs. They also knew that their brother, W. H., had obtained the account from the executor for the purpose of a careful examination. After W. H. Dodge and Stanton had completed their work, they called upon the executor with a copy of his account of 1875. W. H. Dodge claimed to appear in the settlement for his mother and sisters, Mary E. and Anne F.; Stanton for Martha K. The executor concealed nothing, and made no statement false or in any way calculated to mislead the heirs. W. H. Dodge proposed that if the executor would assume the George D. Dodge notes of $3,400 or thereabouts, at $2,250, which was much more than they were worth, and pay that amount into the estate, it should settle everything. It was agreed by Stickney, Dodge, and Stanton that the account as made up should be changed in accordance with the proposition of W. H. Dodge, and in that shape go to the judge of probate, as approved by Stanton and W. H. Dodge for all parties they represented. Stickney and W. H. Dodge understood that it

was a full settlement and compromise of all matters in contention. Stanton did not understand that the claim upon the executor for loss of Western lands was abandoned or included in the settlement. The account of 1875 was allowed by the judge of probate, and no appeal was taken.

Stanton for Martha K. Dodge, and W. H. Dodge for his mother, brothers, John H. and Oliver A., and sisters, Mary E. and Anne F., assigned the George D. Dodge claim to Stickney, in accordance with this agreement. After the account of 1875 had been approved by the judge of probate, the petitioners signed a receipt as follows :

" I have received of William W. Stickney, executor of the last will of my father, George H. Dodge, late of Hampton Falls, N. H., deceased, at different times, the sum of . . . . . which is in full for my share of the personal property belonging to the estate of the said deceased, which by the terms of his will was to be divided equally among his children in the year 1875. The property thus divided will appear, from the account of said executor, as settled in the probate court for the ·county of Rockingham on May 21, 1875. The lands in the state of Wisconsin and in the state of Minnesota, belonging to said estate, and the notes given for lands in Wisconsin in the hands of the executor, unpaid, are not included. in this settlement, but remain unsettled."

The executor had been in the habit of advancing sums of money to the children of the testator, upon their representations that it would greatly subserve their interest, if the money coming in 1875 could be advanced to them before that time. As a result, when George D., William H., and Oliver A. came to sign receipts in 1875 for the nominal sum of $10,366.51 each, little if any money was received by the sons, and George D. found himself in debt to the executor. If he had not advanced George D. so much, and had not paid him his annuity, both of the George D. Dodge notes would have been collectible in 1875. There was no evidence that the state of the account between the executor and George D. was known to the other children.

On the 20th day of February, 1878, Stickney presented his fourth account to the probate court, in which he charged himself with the amount of personal estate in his hands at the previous settlement in 1875, and with a small amount received since the last settlement. He discharged himself by exhibiting the receipts of the heirs before alluded to, and by showing that he had paid taxes on western lands to the amount of $789.71, assessed since the 1875 settlement, and some other smaller amounts. Stanton appeared before the probate court for the widow, and all the petitioners, except George D. Dodge, in opposition to the allowance of the account, and claimed, among other things, that the executor should be charged for the value of the western lands lost; for $1,500 lost through Sloan & Patten; for all sums allowed the

executor in previous accounts as paid to redeem western lands, etc., over and above the actual amount of the taxes assessed; that each and everything connected with the executor's proceedings under the Bailey mortgage was open to examination. He also claimed that the executor should be charged for $1,150 lost to the estate in the loan to George D. Dodge.

The judge of probate allowed the account as presented by the executor, and Stanton, for the parties he represented, claimed an appeal. This petition for leave to appeal was filed February 17, 1880.

To show that injustice had been done by the decree of the probate court, evidence was introduced in support of only three causes of appeal as set forth in the petition,—the 6th, the 22d, and 23d. The referee found specially that the loan to George D. Dodge was assented to by all these petitioners, in part, and by some to the full amount; that by assuming it at $2,250 the executor took upon himself a claim upon which he may not realize more than $500; that this adjustment was favorable to these petitioners; that no injustice had been done them by the decree of the probate court upon this matter; that upon all the facts in the cause the executor acted in good faith in all his dealings with the Bailey mortgage; that he has accounted for all he has received on account of it; that he has expended on account of the Western lands all he has claimed in his accounts; that in the case of said mortgage interest and the Western lands he has acted with ordinary care and diligence; and that no injustice was done the petitioners upon this point by the decree of the judge of probate.

*W. J. Copeland* and *T. J. Smith*, for M. K. Cunningham and Annie F. Dodge; *W. L. Foster*, for Martha K. Dodge; *E. D. Rand*, for O. A. Dodge.

*J. F. Wiggin* and *J. S. H. Frink*, for the defendant.

STANLEY, J. As the petitioners cannot now appeal from the decree of the judge of probate, as a matter of right (G. L., *c.* 207, *s.* 2), they ask leave to appeal under G. L., *c.* 207, *s.* 9, which is as follows: "If it appear that the petitioner has not unreasonably neglected to appeal, and that injustice has been done by the decision of the judge, such appeal shall be allowed, heard, and tried on such petition." One point decided by the referee is, that no injustice has been done by the probate decree. On that issue it is suggested that it is only necessary for the petitioners to present a *prima facie* case, and that the merits of the controversy are to be tried at a subsequent time, if at all. If the parties could demand a trial of the merits of the appeal, when granted, by some tribunal other than the court, or a referee appointed by the court, as by a jury (*Matthews* v. *Fogg*, 35 N. H. 289, *Moulton's Petition*,

50 N. H. 532, *Gitchell* v. *Andover*, 59 N. H. 363, *Patrick* v. *Cowles*, 45 N. H. 553, 555), the question raised might be more serious. But when the question of the right to appeal under the statute, and the question of the right to have the decree reversed, are both to be tried by a referee on the same issue, there seems to be no good reason why the referee may not, in the first instance, hear the whole case, instead of a part of it; or why he should decide at one time that the petitioners have made out a *prima facie* case of a right to appeal on the ground that injustice has been done, and at another time that they have proved their right to a reversal of the decree on the same ground by a preponderance of evidence on the whole case. Such a mode of procedure would be attended with useless inconvenience and expense, and would result in unreasonable and vexatious delay. Not being a necessary or convenient mode of procedure in this case, it is not to be 'adopted.

The case is before us on the plaintiffs' motion to set aside the report of the referee, on the ground that he mistook the law applicable to the facts. The motion presents a question similar to that raised by a motion to set aside the verdict of a jury, which is claimed to be opposed to the law and the evidence of the case, and, in some cases, it may properly be addressed to this court at the law term. *Dodge* v. *Stickney*, 60 N. H. 461, 462. It is simply a question of the competency of the evidence to support the facts found or the conclusions reached by the referee. If there was any evidence before him from which he could legally find in favor of the defendant, his report will not be disturbed. *Wendell* v. *Safford*, 12 N. H. 171; *Lisbon* v. *Bath*, 21 N. H. 319; *Wendell* v. *Moulton*, 26 N. H. 41; *Gould* v. *White*, 26 N. H. 178; *Palmer* v. *Portsmouth*, 43 N. H. 265, 267; *Clark* v. *Society*, 45 N. H. 331, 333; *Free* v. *Buckingham*, 59 N. H. 219, 223.

Whether the executor's settlement with George D. Dodge was a fair one, conducted without fraud and reasonably favorable to the estate, and whether the petitioners assented to it and voluntarily signed the receipt mentioned in the case, were matters of fact properly before the referee, which he has decided affirmatively on competent evidence; and his additional finding, that no injustice resulted to the petitioners from the probate decree, so far as it recognized and was based upon that settlement, whether a conclusion of law or of fact, necessarily followed. They could not complain of what they voluntarily and fairly agreed to. If they did not use extreme caution in reference to the settlement, and if it now appears to them that it was not for their interests to settle in that way, they cannot hold the executor, who concealed nothing, and acted in good faith, responsible for their want of judgment. *Griswold* v. *Chandler*, 5 N. H. 492, 495; *Wyman's Appeal*, 13 N. H. 18. It is, therefore, unnecessary to consider how section 7, chapter 207, Gen. Laws, limiting the time within which the court may allow an appeal in cases like this, affects the petitioner's right

to an appeal on this branch of the case, for the justice of their claim has been tried and determined against them.

It is claimed that the finding of ordinary care and prudence on the part of the executor in his management of the estate's affairs in the West is inconsistent with his previous finding of facts. It is argued that the executor's employment of Sloan & Patten, through whose fraud and perhaps crime a large part of the estate was lost, amounted in law to a delegation of his trust, and that consequently he is responsible to the estate for the loss. But a reasonably prudent and necessary mode of dealing with trust estates may often warrant the employment of agents, on whose judgment, discretion, and integrity the trust interests must practically depend. If an executor or trustee could not, in the exercise of due caution, employ agents and rely on their judgment and honesty in the transaction of business matters pertaining to the trusts, without being held responsible for a successful issue in every instance, many estates would remain unsettled for want of sufficiently courageous trustees. The general rule of law, that an executor cannot delegate his office to others, is unquestioned, but like most legal principles it is bounded and defined by reason. If applied with literal precision in all cases, it might become inconvenient and burdensome, or obsolete and useless; if understood and interpreted in the light of what is reasonably proper and necessary to be done under the circumstances of each case, it furnishes a sufficient protection to trust estates, and a practical method for their administration and settlement. It might be difficult to assign a good reason for the proposition that an executor is to be held responsible in the settlement of his estate for doing what other ordinarily prudent and sagacious men would have done; or the converse, that his action or non-action is to be commended when men in general would have done otherwise in the prosecution of their personal affairs. If it is reasonably necessary for a trustee to employ agents or attorneys, and if he uses ordinary care in their selection, and a proper supervision over the business entrusted to them, he cannot be held liable for their indiscretion resulting without fault on his part. *Ex parte Belchier*, Amb. 218, 219; *Joy* v. *Campbell*, 1 Sch. & L. 328, 341; *Jones* v. *Lewis*, 2 Ves. Sen. 240, 241; *Thompson* v. *Brown*, 4 Johns. Ch. 619; *Clough* v. *Bond*, 3 Myl. & C. 490, 497; Per. Trusts, *s.* 419; Sto. Eq. Jur., *s.* 1269.

Whether it was reasonably necessary for the executor in this case to employ agents in the West, whether in the employment of Sloan & Patten and in his instructions to them he used due care, whether he exercised a proper supervision over them in their execution of the agency, and whether in any respect he omitted "such care and diligence as men fit to be entrusted with such matters may fairly be expected to put forth in their own business of equal importance" (3 Redf. Wills 391), are all questions of fact properly found by the referee, and not open for discussion

here. In many of the cases relied upon by the petitioners, no reasonable necessity or excuse appeared for the apparent delegation of the trust (*Styles* v. *Guy*, 1 Macn. & G. 422, *Turner* v. *Corney*, 5 Beav. 517, *Brice* v. *Stokes*, 11 Ves. 319, *Hulme* v. *Hulme*, 2 M. & K. 682, *Lincoln* v. *Wright*, 4 Beav. 427), in others the question depended upon a construction of words used in a will, deed, or other instrument creating the trust (*Berger* v. *Duff*, 4 Johns. Ch. 368, *Pearson* v. *Jamison*, 1 McLean 199, *Niles* v. *Stevens*, 4 Denio 399, 404, *Alexander* v. *Alexander*, 2 Ves. Sen. 640, *Attorney General* v. *Scott*, 1 Ves. Sen. 413, 417, *Hitch* v. *Leworthy*, 2 Hare 200, *Doe* v. *Robinson*, 24 Miss. 688), and in some the language used by the judges, who were the triers both of fact and of law, was often an expression of opinion on a finding of fact, and not the enunciation of a legal principle. *Thompson* v. *Finch*, 22 Beav. 316; *Bostock* v. *Floyer*, L. R. 1 Eq. 26; *Eaves* v. *Hickson*, 30 Beav. 136. In properly weighing the authorities, a distinction also is to be noted between decisions at law and in equity, especially in jurisdictions where the two systems are distinct, and the boundaries between them are well defined. Decisions of a court having common-law jurisdiction only, are frequently worthless as authorities in equity. *Crosse* v. *Smith*, 7 East 246, 256; *McDonnell* v. *White*, 11 H. L. Cas. 570, 578, 587; *Upson* v. *Badeau*, 3 Bradf. 13, 15.

The case having been tried on its merits and determined adversely to the petitioners, it is unnecessary to consider the objection that they have "unreasonably neglected to appeal" under G. L., c. 207, s. 2.

*Petition dismissed.*

All concurred.